## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA
## BIG STONE GAP DIVISION

| | | |
|---|---|---|
| **LAURA L. FIELDS,** | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 2:09cv00024 |
| | ) | |
| v. | ) | **OPINION** |
| | ) | |
| **MICHAEL J. ASTRUE,** | ) | |
| **COMMISSIONER OF** | ) | By: James P. Jones |
| **SOCIAL SECURITY,** | ) | Chief United States District Judge |
| | ) | |
| Defendant. | ) | |

*Joseph E. Wolfe, Wolfe, Williams, Rutherford & Reynolds, Norton, Virginia, for Plaintiff; Andrew C. Lynch, Special Assistant United States Attorney, Social Security Administration, Philadelphia, Pennsylvania, for Defendant.*

In this social security case, I will affirm the decision of the Commissioner denying benefits.

### I. Background and Standard of Review

The plaintiff, Laura Fields, ("Fields"), filed this action challenging the final decision of the Commissioner of Social Security, ("Commissioner"), denying Fields's claims for supplemental security income, ("SSI"), and disability insurance benefits, ("DIB"), under the Social Security Act, as amended, ("Act"), 42 U.S.C.A. §§ 423, 1381 *et seq.* (West 2003 & Supp. 2009). Jurisdiction of this court is pursuant to 42 U.S.C.A. §§ 405(g) and 1383(c)(3). (West 2003 & Supp. 2009).

The court's review in this case is limited to determining if the factual findings of the Commissioner are supported by substantial evidence and were reached through application of the correct legal standards. *See Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987). Substantial evidence has been defined as "evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance." *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966). "'If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence."'" *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990) (quoting *Laws*, 368 F.2d at 642).

The record shows that Fields filed her applications for DIB and SSI on January 3, 2006, alleging disability as of May 14, 2004, (Record, ("R"), at 63-65), due to right knee, ankle, foot, wrist and hand problems, as well as depression. (R. at 72.) The claims were denied initially and upon reconsideration. (R. at 40-41, 46-51.) Fields then requested a hearing before an administrative law judge, ("ALJ"). (R. at 34.) A hearing was held on July 25, 2007, at which Fields was present and represented by counsel. (R. at 409-446.)

By decision dated October 25, 2007, the ALJ denied Fields's claims. (R. at 13-28.) The ALJ found that Fields met the insured status requirements of the Act through December 31, 2008, and had not engaged in substantial gainful activity since May 14, 2004, her alleged onset date of disability. (R. at 19.) The ALJ found that Fields had the following severe combination of medically determinable impairments: obesity, osteoarthritis of the right knee, foot and ankle, status-post right knee surgery for an anterior cruciate ligament, ("ACL"), tear, possible carpal

tunnel syndrome of the right elbow to wrist and depression. (R. at 19.) However, the ALJ found that the impairments, individually or in combination, did not meet or medically equal one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. at 20.) The ALJ found that Fields had the residual functional capacity to perform sedentary[1] work, i.e., no prolonged or frequent standing or walking and no lifting or carrying items weighing more than 10 pounds. (R. at 25.) Further, the ALJ stated that Fields must be allowed to alternate sitting and standing "a couple of times per workday more than would be allowed by scheduled breaks." (R. at 25.) It was determined that Fields could never climb, but could occasionally balance, kneel, crawl and stoop. (R. at 25.) The ALJ found that she needed an air-conditioned environment and she should not be in a position that required repetitive use of her right hand for manipulation. (R. at 25.) Additionally, the ALJ found that Fields was limited to simple, non-complex tasks. (R. at 26.) The ALJ found that Fields was unable to perform any of her past relevant work. (R. at 26.) Further, the ALJ found that transferability of job skills was not important because using the Medical-Vocational Rules as a framework supported a finding that Fields was "not disabled" regardless of whether she had transferable job skills. (R. at 27.) After considering Fields's age, education, work experience and residual functional capacity, the ALJ determined that there were jobs that exist in significant numbers in the national economy that she could perform. (R. at 27.) Thus, the ALJ found that Fields was not under a disability as defined by the Act. (R. at 28.) *See* 20 C.F.R. §§ 404.1520(g) and 416.920(g).

---

[1] Sedentary work involves lifting items weighing up to 10 pounds with occasional lifting or carrying or articles like docket files, ledgers and small tools. *See* 20 C.F.R. §§ 404.1567(a), 416.967(a) (2009).

After the ALJ issued her decision, Fields pursued her administrative appeals and sought review of the ALJ decision, (R. at 399), but the Appeals Council denied her request. (R. at 6-9.) Fields then filed this action seeking review of the ALJ's decision, which now stands as the Commissioner's final decision. *See* 20 C.F.R. §§ 404.981, 416.1481 (2009). This case is now before the court on Fields's motion for summary judgment, which was filed on October 13, 2009, and the Commissioner's motion for summary judgment filed on November 12, 2009.

## *II. Facts*

Fields was born in 1971, which classifies her as a "younger individual" under 20 C.F.R. §§ 404.1563 and 416.963. (R. at 63.) Fields has a high school education and past work experience as an assembler, a vacuum cleaner sales person, a sewing machine operator and a telemarketer. (R. at 73, 77.)

At the hearing on July 25, 2007, the ALJ ordered that the record be left open for 10 business days after the hearing to allow Fields to submit additional medical evidence. (R. at 414.) Fields testified that she had a hysterectomy approximately five prior to the hearing. (R. at 415.) Fields claimed that her fiancé was her only source of support, explaining that he purchased her groceries and paid her bills. (R. at 416.) Fields testified that she had not had any specialized training or classes. (R. at 417.) She admitted that she could read and understand a newspaper, but claimed to have trouble with some of the terminology. (R. at 417.)

Fields claimed that her last place of employment was Fairfield Resorts, where she worked as a telemarketer selling vacations. (R. at 417.) Fields testified that she worked at this job "on and off" for three years and was paid eight dollars per hour, plus a commission for each sale. (R. at 417.) Fields claimed that she was employed at this job during the time period she was involved in an automobile accident. (R. at 418.) However, upon questioning by the ALJ, Fields disclosed that she had quit the job prior to her automobile accident. (R. at 419.) The job required her to input information into computers and never required her to lift items. (R. at 418.) Prior to working for Fairfield Resorts, Fields sold vacuum cleaners door-to-door for approximately three weeks. (R. at 419.) Preceding that, Fields worked in a factory that made ladders, but had to quit due to prolonged standing. (R. at 419.) Fields testified that she would consider her regular line of work to be working in the sewing factory, which she did on and off for 10 years. (R. at 419.)

In 2004, Fields was involved in an automobile accident, which resulted in a knot on her head, a cut to her arm and hand, bruising to her stomach and chest and a torn ACL in her right knee. (R. at 420.) Fields testified that after undergoing physical therapy for one to two months without adequate progress, she was forced to have surgery on her right knee. (R. at 420.) That same year Fields began to experience other physical problems. (R. at 421.) An old ankle injury worsened, which required her to see a nurse practitioner. (R. at 421.) Furthermore, Fields testified that doctors determined that she had permanent nerve damage. (R. at 422.) In March 2006, Fields received an $80,000 settlement from an insurance

company for the accident; after medical bills and attorney's fees were paid Fields received $23,000 to $24,000. (R. at 422.)

In addition to the medical problems mentioned above, Fields testified that she had trouble with her arm, stating that while no problems were found, carpal tunnel syndrome was not ruled out. (R. at 423.) Fields testified that she experienced pain from her right elbow to her right wrist, noting that her dominant hand was her right hand. (R. at 423-24.) Fields claimed that the trouble with her arm required her to place it on a pillow while she slept. (R. at 424.) Fields stated that, according to doctors, the problems with her knee and feet would not improve beyond their current state. (R. at 424.) Fields claimed that she experienced pain in her right knee, which, because of nerve damage extended all the way down her legs, and feet every day, requiring her to take ibuprofren three times a day. (R. at 424-25.) Fields claimed that although both of her feet hurt, her right foot gave her the most problems. (R. at 425.)

In addition to her physical problems, Fields testified that she had been diagnosed with depression, which she claimed worsened after the automobile accident. (R. at 425.) Furthermore, Fields claimed that she had diminished concentration and complications with her memory, which she opined could have been related to hitting her head during the automobile accident. (R. at 425.) Fields alleged that her mental deficiencies would negatively impact her past work as a telemarketer, because she would not be able to remember and deliver her sales "pitch" or what was included with each package. (R. at 425.) Additionally, Fields

6

stated that she was irritable and easily flustered after the accident. (R. at 425.) Fields testified that her mental conditions would prevent her from making an adequate number of sales. (R. at 426.) Fields admitted that she had not tried to work as a telemarketer since the accident and that she could still read. (R. at 426.)

Fields testified that she first sought counseling after her physician suggested she see a psychiatrist, which she could not afford. (R. at 428.) Fields claimed that she began going to Cumberland Mountain Community Services once a week at the end of 2006 (R. at 428.) Fields claimed that, since the accident, she had experienced trouble concentrating, maintaining concentration, dealing with stresses and crying spells. (R. at 429.) Fields stated that she had benefited from counseling and had been prescribed Wellbutrin and Celexa. (R. at 430.) According to Fields, since she could not work, she had a lot of time for introspection and that had greatly affected her. (R. at 430-31.) Fields testified that counseling allowed her to discuss how to deal with her physical limitations and her childhood, including sexual abuse by a family member. (R. at 431.) She stated that her problems have changed her interactions with her family and she no longer enjoyed socializing with a large number of people. (R. at 434.)

Fields testified that she had trouble with excessive weight and that it led to cholesterol problems. (R. at 434.) Fields claimed that if she sat for an extended period she needed to elevate her leg, but she admitted that sitting was not a significant problem. (R. at 434.) However, Fields claimed that she could stand for only a few minutes before her knee would begin to hurt. (R. at 434-35.)

Additionally, Fields alleged that her arm would begin to hurt after activities such as washing the dishes. (R. at 435.) Fields alleged that, even after surgery and treatment she did not experience any improvement with the injuries she suffered in the automobile accident. (R. at 435.)

In addition to the testimony of Fields, the ALJ heard testimony from a vocational expert, Leah Pary Salyers. (R. at 436-443.) Salyers testified that Fields's past work as a telemarketer was sedentary, semi-skilled work; the job as a vacuum salesperson was light,[2] unskilled work; and her jobs as a sewing machine operator ranged from light to medium,[3] semi-skilled work. (R. at 437.) Salyers opined that Fields did not have any transferable job skills. (R. at 437.)

The ALJ asked Salyers to consider a hypothetical individual with Fields's age, education and background at the sedentary exertional level. (R. at 437.) Additionally, the hypothetical individual would have a moderate reduction in concentration, limiting her to simple, non-complex tasks; she would need to make brief postural adjustments a couple of times more than normal; she could never climb, but could occasionally balance, kneel, crouch, crawl and stoop; she should be in air-conditioned and heated environments, rather than outdoors; and she

---

[2] Light work involves lifting items weighing up to 20 pounds at a time with frequent lifting or carrying of items weighing up to 10 pounds. If an individual can perform lightwork, that person can also perform sedentary work. *See* 20 C.F.R. §§ 404.1567(b), 416.967(b) (2009).

[3] Medium work involves lifting items weighing up to 50 pounds at a time with frequent lifting or carrying of objects weighing up to 25 pounds. If an individual can do medium work, that person can also perform sedentary and light work. *See* 20 C.F.R. §§ 404.1567(c), 416.967(c) (2009).

should not be in a job that required repetitive use of the right hand for fine manipulation. (R. at 437.) Salyers opined that the hypothetical individual could work as a non-emergency dispatcher, a security monitor or a surveillance system monitor, explaining that such jobs existed in significant numbers in the national and regional economies. (R. at 438-39.) Furthermore, Salyers testified that the jobs did not require significant interaction with the general public. (R. at 439.)

Next, Salyers was asked to consider the findings contained in Exhibit 19F.[4] (R. at 439.) Salyers indicated that this document did not provide her with enough information because it did not evaluate Fields's ability to handle work stressors or work activities. (R. at 440.) Next, Salyers was asked to consider the limitations contained in Exhibit 18F.[5] (R. at 440.) Salyers indicated that such limitations "might preclude the sustainability of employment in a competitive setting." (R. at 440-41.) Salyers indicated that even if Fields's testimony that she often forgot what she was talking about mid-sentence was accepted as true, it would still not preclude any of the previously listed jobs. (R. at 442.) Salyers stated that if Fields's knee impairment would cause her to miss more than two days of work per month she would be precluded from employment. (R. at 443.) Additionally, Salyers testified that if Fields's knee pain caused her to have a lapse in concentration for up to one-third of the workday it could affect employment opportunities. (R. at 443.)

---

[4] Exhibit 19F is a Medical Assessment Of Ability To Do Work-Related Activities (Mental) completed by Annette Taylor on June 11, 2007. (R. at 380-81.)

[5] Exhibit 18F is a Medical Assessment OF Ability To Do Work-Related Activities (Mental) completed by Sharon Hall-Anderson on May 24, 2007. (R. at 377-79.)

In rendering her decision the ALJ considered medical evidence from: Dr. Wallace Huff, Jr., M.D.; Johnston Memorial Hospital; Dr. William Humphries, M.D., a state agency physician; Joseph Leizer, Ph.D., a state agency psychologist; Dr. Shirish Shahane, M.D., a state agency physician; Stone Mountain Health Services; Dr. Richard Surrusco, M.D., a state agency physician; Julie Jennings, Ph.D., a state agency psychologist; Abingdon Orthopedic Associates; Lebanon Physical Therapy; Patrick Farley, Ed.D.; Cumberland Mountain Community Services; Sharon M. Hall-Anderson; Annette Taylor; Tri-County Health Clinic and Dr. Samuel Scott, D.P.M.  Subsequent to the ALJ hearing, Fields's counsel submitted additional records from: Tri-County Health Clinic, Stone Mountain Health Services, Johnston Memorial Hospital and the University of Virginia Medical Center.

Fields was seen by Dr. Wallace Huff, Jr., M.D., of Abingdon Orthopedic Associates, on May 21, 2004, after being referred for an evaluation of her knee. (R. at 150-51.)  Dr. Huff noted that Fields was a pleasant female, who was involved in a motor vehicle accident that caused an injury to her right knee and facial contusions. (R. at 150.)  Fields denied any previous injury to her knee, other than some complaints of occasional anterior knee pain attributed to playing softball. (R. at 150.)  Dr. Huff indicated that Fields's past medical history was unremarkable, but noted that her past surgeries included a tubal ligation, hysterectomy and cholecystectomy. (R. at 150.)  Further, Dr. Huff noted that Fields had been prescribed Lortab and Xanax. (R. at 150.)  Dr. Huff found Fields

to be alert and oriented in all spheres, she had an antalgic gait on the right with 3+ effusion, positive anterior drawer and Lachman sign with negative posterior drawer. (R. at 150.) Additionally, Dr. Huff observed that Fields's range of motion was zero to 90, she had difficulty holding her straight leg raise actively, but could do so for a short period of time, and that her circulation and skin were grossly intact. (R. at 150.) Fields's magnetic resonance imaging, ("MRI"), results showed her to have a complete ACL tear, effusion and bone contusion consistent with an ACL injury. (R. at 150.) Dr. Huff diagnosed Fields with a right ACL acute tear, status post motor vehicle accident. (R. at 150.) Dr. Huff discussed Fields's options with her, both non-operative and operative, and ultimately recommended waiting until she regained strength in her quadriceps and her range of motion before proceeding. (R. at 150.) To help her regain strength and range of motion in her knee, Dr. Huff referred Fields to Lebanon Physical Therapy. (R. at 150.) Dr. Huff prescribed Lortab for pain, with no refills, and recommended she continue taking Aleve. (R. at 151.)

On June 29, 2004, Fields presented to Dr. Huff for a follow-up visit. (R. at 149.) Fields reported knee pain when walking or climbing stairs and stated that her knee would give out once or twice a week. (R. at 149.) Dr. Huff found that Fields's swelling had decreased, her range of motion was a full 0 to 120, with good collateral stability, she had 3+ anterior drawer with a positive posterior pivot shift and trace effusion. (R. at 149.) Dr. Huff observed tenderness over the posterolateral joint line, which was probably from her bony contusion. (R. at 149.) Fields indicated that she was interested in proceeding with an ACL reconstruction surgery and Dr. Huff disclosed the details of the operation, including the risks and

benefits, usual preoperative and rehabilitative courses, and scheduled the surgery. (R. at 149.)

On August 17, 2004, Fields returned to Dr. Huff's office for a post-operative appointment. (R. at 149.) Dr. Huff found Fields's portal sites to be well healed and she had a good range of motion. (R. at 149.) Dr. Huff indicated that Fields could stop wearing her knee brace and use crutches. (R. at 149.) Additionally, Dr. Huff noted that Fields had good stability on gentle stress testing. (R. at 149.)

On September 7, 2004, Fields presented to Dr. Huff reporting that her knee was getting better, although she did note some soreness medially. (R. at 148.) Dr. Huff indicated that a graft on ligament testing felt intact, without any problems and with a firm endpoint. (R. at 148.) Dr. Huff decided to begin to wean Fields from using her crutches and continue therapy based strengthening exercises. (R. at 148.)

On October 19, 2004, Fields was examined by Dr. Huff, who noted that it was three and a half months since her ACL reconstruction and she was doing well. (R. at 148.) Dr. Huff indicated that Fields had good stability on ligament testing, her range of motion was excellent and she had a normal gait. (R. at 148.) However, Fields claimed that she still had weakness going up and down stairs. (R. at 148.) Dr. Huff instructed Fields that she needed to work on her strengthening long-term, but that he would discharge her from formal therapy and place her on a home program. (R. at 148.)

On December 21, 2004, Fields returned for a follow-up visit with Dr. Huff. (R. at 147.) Dr. Huff indicated that Fields's knee was doing well, she had good stability and a full range of motion. (R. at 147.) Fields reported that she had difficulty squatting and claimed to have pain in the anterior aspect of the knee with crepitus on examination consistent with chondromalacia. (R. at 147.) Further, Dr. Huff indicated that Fields reported "tingling along the medial aspect of the calf consistent with a saphenous nerve injury." (R. at 147.) Dr. Huff noted that Fields had pain along the calf area down to the medial ankle. (R. at 147.) Dr. Huff opined that the complications were "consistent with possible injury to the saphenous nerve, possibly from a hamstring graft harvest." (R. at 147.) Dr. Huff prescribed Neurontin to Fields. (R. at 147.) On February 22, 2005, Fields presented to Dr. Huff with complaints of continued "numbness along the medial calf from the ankle all the way up to the medial knee with tingling in that distribution." (R. at 147.) Dr. Huff noted that he was concerned about a saphenous nerve injury and scheduled an electromyography, ("EMG"), in an attempt to identify the cause of the numbness. (R. at 147.)

An EMG was performed at Mountain Empire Neurological Associates on March 7, 2005, by Dr. Douglas Williams, M.D. (R. at 152-53.) Dr. Williams found that the results of the EMG and nerve conduction studies were normal. (R. at 153.) On March 22, 2005, Fields returned to Dr. Huff's office. (R. at 146.) Dr. Huff observed that Fields was doing well, with a nice, stable knee on ligament testing and a full range of motion. (R. at 146.) Fields reported that she was still

experiencing numbness in the saphenous nerve distribution.  (R. at 146.)  Dr. Huff indicated that "at [that] point she [was] at maximum medical improvement," and stated he would give her a rating regarding the saphenous nerve problem.  (R. at 146.)

In a letter to Fields's former attorney, Gene Cochran, dated April 5, 2005, Dr. Huff noted that based on the *American Medical Association Guide For Evaluation Of Permanent Impairment, Fifth Edition*, Fields had a "permanent impairment due to sensory loss of the medial calf and leg, [five percent] of the involved extremity, which is equivalent to [two percent] whole person impairment."  (R. at 145.)  Dr. Huff went on to say that the impairment was permanent, there were no restrictions regarding Fields's knee and she otherwise had a good functional result.  (R. at 145.)

On May 19, 2005, Fields presented to Dr. Huff reporting that her knee "popped" when coming down a set of stairs.  (R. at 144.)  Fields also claimed that she had occasional pain anteriorly while climbing stairs, as well as crepitus.  (R. at 144.)  An examination performed by Dr. Huff revealed no real effusion, extra-articular swelling medially, a full range of motion, normal gait and good stability on cruciate collateral testing compared to the left knee.  (R. at 144.)  Dr. Huff opined that Fields had recurrent synovitis and pes bursitis, noting there was no sign of a "mechanical injury."  (R. at 144.)  Dr. Huff indicated that Fields was having some pain from patellofemoral chondromalacia, which was subject to "flare-ups," and he predicted that Fields's other conditions could "flare-up."  (R. at 144.)  Dr.

Huff stated that Fields would probably require sporadic physician visits indefinitely. (R. at 144.) Dr. Huff prescribed Relafen to Fields and noted that her condition was unimproved and that she was at maximum medical improvement. (R. at 144.)

On August 26, 2005, Fields reported to Dr. Huff for a follow-up visit. (R. at 143.) Fields reported continued sensitivity of the medial aspect of the leg on the right due to her saphenous injury. (R. at 143.) Dr. Huff found that Fields had good stability on cruciate and collateral testing, normal gait, some crepitus in the patellofemoral joint, with intermittent pain in the area with deep flexion. (R. at 143.) Further, Dr. Huff stated that he thought Fields had lost some sensation over the saphenous nerve medially, which would be a permanent loss of sensation. (R. at 143.) Dr. Huff prescribed Neurontin. (R. at 143.)

On November 29, 2005, Fields returned to Dr. Huff's office complaining that her knee had given out a couple of times. (R. at 142.) Fields expressed concern over the stability of her knee, but Dr. Huff observed that she had a normal Lochman's and anterior drawer sign. (R. at 142.) Dr. Huff noted that Fields had nerve sensitivity in the sural nerve medially. (R. at 142.) Dr. Huff decided that Fields should continue to take Neurontin, and should do so indefinitely. (R. at 142.)

Fields was again treated by Dr. Huff on December 13, 2005, when she returned to discuss the results of her MRI. (R. at 142.) The MRI showed chondromalacia of the patellofemoral and lateral compartment. (R. at 142.) Dr. Huff noted that the ACL graft appeared to be intact, Fields had no instability, her range of motion was good and she had some pain, which he attributed to synovitis and early degenerative wear. (R. at 142.) After discussing various treatment options, Fields decided to have an injection of Celestone and Xylocaine. (R. at 142.)

During Fields's course of treatment with Dr. Huff, she underwent physical therapy to rehabilitate her ACL at Lebanon Physical Therapy, ("LPT"), from May 25, 2004, to June 17, 2004. (R. at 347-382.) On May 25, 2004, Fields rated the pain as a three on a ten-point scale at its best, and a seven on a ten-point scale at its worst. (R. at 348.) The physical therapist noted that Fields ambulated with bilateral axillary crutches and a step-to gait pattern. (R. at 348.) Sensation was intact to light touch throughout bilateral lower extremities and was symmetrical. (R. at 348.) Fields reported tenderness over the patella tendon, medial anterior joint line, quadriceps tendon and medial and lateral gastroc heads. (R. at 348.) Fields's knee range of motion on extension was -19 degrees for her right knee and positive one degree for the left knee, and on flexion it was 60 degrees active and 92 degrees passive for the right knee and 130 degrees for the left knee. (R. at 348.) During the manual muscle test the right hip flexion was 4/-5, left hip flexion was 5/5, right hip abduction 4/5, left hip abduction 4+/5, right knee extension 3/5, left knee extension 5/5, right knee flexion 4/5 and left knee flexion 5/5. (R. at 348.)

The physical therapist found Fields to be pleasant and noted that she showed decreased strength, range of motion and weight bearing, swelling and she complained of discomfort. (R. at 349.) Fields reported that she did not want surgery and felt that it could be avoided because she had a low activity, sedentary lifestyle. (R. at 349.) Short-term goals were listed as: developing an independent home exercise program to foster self-care, decreasing her pain level to less than or equal to a five on a 10-point scale at its worst, to improve comfort, and increase right knee flexion and extension by 10 to 20 degrees. (R. at 349.) Long-term goals were listed as: Fields being able to fully bear her weight on the right leg, increase right knee flexion and extension to be within normal limits and increase right knee strength to 4-4+/5 in flexion and extension. (R. at 349.)

Throughout the remainder of her physical therapy sessions, Fields consistently reported that her knee was getting better, she was experiencing a decrease in swelling and her knee was feeling stronger. (R. at 351-385.) Eventually, Fields improved to the point that she no longer needed to use her crutches and regained her range of motion. (R. at 384-85.) On June 17, 2004, Fields presented to LPT stating that she no longer used her crutch or limped as badly as before, and that while her knee felt good she still experienced minor pain and swelling. (R. at 382.) It was noted that Fields had progressed well, improving both her strength and mobility. (R. at 382.)

On March 19, 2004, Fields reported to Johnston Memorial Hospital, ("JMH"), for an ultrasound to evaluate gallstones.  (R. at 169.)  Dr. Casey McReynolds, M.D., evaluated the findings and diagnosed cholelithiasis.  (R. at 169.)  Dr. McReynolds noted that there was generalized gallbladder wall thickening, but the gallbladder was contracted making the finding non-specific.  (R. at 169.)  Dr. McReynolds stated that chronic cholecystitis could not be excluded and that there was no pericolecystic fluid, which would have suggested acute disease.  (R. at 169.)

Fields was treated by Dr. David Smith, M.D., on April 2, 2004, for gallstones.  (R. at 163-64.)  Dr. Smith noted that Fields had an attack of biliary colic approximately three weeks prior to this visit and a subsequent ultrasound showed choletithiasis and gallbladder wall thickening.  (R. at 163.)  During the attack, which lasted for 48 hours, Fields experienced a constant right upper quadrant pain that radiated to her back.  (R. at 163.)  However, during the attack, Fields did not experience a fever, chills or jaundice.  (R. at 163.)  Since the attack, Fields was asymptomatic with back pain after eating spicy food.  (R. at 163.)  Dr. Smith diagnosed Fields with cholelithiasis and cholecystitis.  (R. at 164.)  Dr. Smith indicated that Fields would undergo a laparoscopic cholechstectomy.  (R. at 164.)

On April 12, 2004, Dr. Smith performed a laparoscopic cholecystectomy.  (R. at 159-62.)  Dr. Smith noted that Fields was obese, had documented gallstones, and her gallbladder had extensive adhesions and exhibited chronic cholecystitis.  (R. at 159.)  Dr. Smith successfully performed the procedure and noted that Fields

tolerated it well.  (R. at 160.)  Dr. Smith examined the removed gallbladder and gave a final diagnosis of chronic cholecystitis with cholelithiasis and cholesterolosis.  (R. at 165.)

On May 14, 2004, Fields was treated at JMH following an automobile accident.  (R. at 173, 210-12.)  Fields complained of pain in her forehead, right knee, chest and pubic area.  (R. at 210.)  It was noted by an emergency room physician, whose name is illegible, that Fields also had abrasions on her wrists.  (R. at 210.)  When Fields presented to JMH she was fully immobilized.  (R. at 210.)  Fields was diagnosed with a neck sprain, knee contusion and multiple abrasions.  (R. at 211.)  Reports of x-rays from the radiology department indicated that Fields had a normal chest and cervical spine.  (R. at 173.)  It was observed that there was a diffusion distending the suprapatellar bursa of the right knee, with no other abnormalities noted.  (R. at 173.)

On May 20, 2004, Fields presented to JMH's radiology department for a facial bone series of examination.  (R. at 172.)  It was noted that there was facial pain and swelling.  (R. at 172.)  The examination showed a retention cyst in the right maxillary sinus, with no facial fracture or other bony abnormality.  (R. at 172.)  Also, Fields had a MRI taken of her right knee.  (R. at 166-67.)  The MRI revealed that there was an ACL tear, which was probably a complete tear, and trabecular microfractures in the posterior aspect of the proximal tibia, which were more prominent medially.  (R. at 166.)  Dr. Richard Mullens, M.D., indicated that

the injuries were presumably a result of sublaxation impaction injury. (R. at 166-67.) There also was evidence of a large hemorrhagic effusion. (R. at 167.)

On July 2, 2004, Fields reported to the JMH radiology department for scans of her skull. (R. at 171.) The scans revealed no acute abnormality in the osseous structures; however, it showed a curvilinear density arising from the floor of the right maxillary antrum which could represent a serous or mucous retention cyst. (R. at 171.) There was a minimal opacity projected over the left maxillary antrum along the floor with thickening of the mucosa superiorly and laterally. (R. at 171.) Dr. Ernest Coburn, M.D., opined that the changes were consistent with chronic or acute sinusitis. (R. at 171.)

Fields reported to JMH on July 2, 2004, for a computerized axial tomography, ("CT"), scan to determine the cause of her alleged headaches. (R. at 168.) It was noted that there were four millimeter cuts through the posterior fossa and five millimeter cuts through the remaining portion of the calvarium. (R. at 168.) The CT scan revealed no evidence of intracranial hemorrhage, subdural hematoma or infarction. (R. at 168.) Dr. Coburn noted that the CT scan did not show any abnormalities. (R. at 168.)

On August 4, 2004, Dr. Huff performed an ACL reconstruction surgery using semitendinous gracilis autograft to repair the ACL injury Fields suffered in

the automobile accident. (R. at 155-56.) Dr. Huff performed the surgery and noted that Fields was sent to the recovery room in good condition. (R. at 156.)

On August 5, 2004, Fields underwent an initial assessment performed by a JMH physical therapist, whose name is illegible. (R. at 204-205.) The physical therapist discussed the rehabilitation process, developed a treatment plan and goals. (R. at 205.) On August 10, 2004, Fields returned to JMH for physical therapy and reported that she was doing better and had more movement in her knee. (R. at 202-03.) The physical therapist noted that Fields's range of motion was improving. (R. at 203.) Fields presented to JMH for physical therapy again on August 16, 2004, following the same treatment regimen and exhibited knee swelling and effusion. (R. at 200-01.) Fields's range of motion was zero to 84. (R. at 201.) Also on August 18, 2004, a status report was completed by the JMH physical therapist and it was indicated that Fields was progressing well. (R. at 191.) On August 19, 2004, Fields reported to the JMH physical therapist that she was not able to get as much range of motion as her last visit because her knee cap was shifting. (R. at 198-99.) The physical therapist noted that, during knee bends, Fields had a large amount of crepitus in her left knee and that her pain in the right knee was rated as an eight on a ten-point scale at its worst and a five on a ten-point scale at its best. (R. at 199.) On August 23, 2004, Fields's range of motion was zero to 92. (R. at 196.) On August 26, 2004, Fields reported to her physical therapist that her knee was feeling better and she had not been required to push it down since her last appointment. (R. at 194.) Her range of motion improved to zero to 95. (R. at 194-95.) On August 31, 2004, Fields again attended a physical therapy session in which she reported that her knee had extended further than

normal and, while she felt pain, there was no subsequent swelling. (R. at 192-93.) However, Fields did report that after traveling to and from North Carolina her knee became swollen. (R. at 192.) The physical therapist noted that prior to the session Fields's full knee extension was minus five degrees, and after the session her range of motion was negative two to 100. (R. at 193.)

At her September 7, 2004, physical therapy session, Fields reported that her knee had been feeling good. (R. at 189-90.) It was noted that Fields continued to improve her range of motion, increasing it to negative two to 105. (R. at 190.) At an appointment on September 9, 2004, Fields stated that she was only using one crutch and was doing well with it, but stated that her knee had been sore in the early morning while she was trying to sleep. (R. at 187.) Fields's range of motion improved to 112 degrees. (R. at 188.) On September 13, 2004, Fields range of motion had improved to zero to 114. (R. at 186.) On September 16, 2004, Fields, still using only one crutch, reported that she had experienced increased soreness in her knee due to an increase in exercises. (R. at 183-84.) Fields completed the typical session and her range of motion continued to improve, increasing to zero to 115. (R. at 184.) On September 30, 2004, Fields came to her physical therapy appointment without using crutches; however, she did ambulate with a limp. (R. at 181-82.) After Fields completed her normal session, the physical therapist noted that Fields's quadriceps had gotten much stronger and she was ambulating with only a slight limp. (R. at 182.)

At her October 5, 2004, appointment Fields reported that the soreness in her knee had increased, which she attributed to being on her feet more often. (R. at 179.) After the day's session, the physical therapist noted that Fields had continued to improve the strength in her quadriceps and had more control of herself during "step-ups." (R. at 180.) On October 12, 2004, Fields's reported that her knee was doing well but she was still experiencing swelling and numbness in her foot. (R. at 177-78.) The physical therapist noted that Fields performed all exercises well, and her range of motion had improved to zero to 125. (R. at 178.) On October 14, 2004, Fields reported that she had to use handrails when climbing stairs and continued to experience swelling and numbness in her foot, but that overall her knee was doing well. (R. at 175.) On October 19, 2004, a report was filed by a JMH physical therapist stating that Fields was progressing in her recovery. (R. at 174.)

On December 5, 2005, Fields went to JMH to have an MRI taken of her right knee. (R. at 222.) The MRI revealed the following: there were susceptibility artifacts due to the previous ACL reconstruction; the reconstructed ligament was intact with no evidence of a recurrent tear; the tendons were intact; there was no evidence of a medial meniscus tear; a vertical area of increased T2 signal in the anterior horn of the lateral meniscus involving the articular surface consistent with a small tear; small joint effusion; tricompartment osteorthritic changes, which were most pronounced in the lateral compartment; the bone marrow signal was normal except for post-surgical changes; and the extraosseous soft tissues were unremarkable. (R. at 221.)

Dr. William Humphries, M.D., a state agency physician, performed a consultative examination of Fields on March 14, 2006. (R. at 222-26.) Fields reported that her primary medical concern was trouble with her feet, and stated that she had experienced pain in her right knee and foot since her automobile accident. (R. at 222.) Fields claimed that the majority of the time she was pain-free, but pain occurred with sitting and was worsened with standing or walking. (R. at 222.) Fields claimed that she could not walk more than 30 yards without having to stop and rest, due to pain and discomfort with her right knee and foot. (R. at 222.) Additionally, Fields stated that she had begun to experience increasing pain in her left knee. (R. at 222.) The second medical condition Fields reported to Dr. Humphries was pain in her right arm. (R. at 222.) Fields stated that the pain had been present for two to three years and extended from her palm to the base of her shoulder. (R. at 222.) Additionally, she claimed to have "mild discomfort on [her] left side." (R. at 222.) Fields stated that the pain was sporadic and was worsened with certain activities, such as holding a telephone. (R. at 222.) Fields claimed that she had not sought medical treatment for this condition due to financial constraints. (R. at 222.) Humphries noted that a "review of systems" revealed that Fields had a small blockage in her heart several years ago, and Fields reported that she did not have the condition investigated. (R. at 223.) Further, Fields told Dr. Humphries that she had been told that she had arthritis in both of her knees. (R. at 223.) Fields reported that she had experienced constant mild headaches and occasional severe headaches since her automobile accident. (R. at 223.)

Dr. Humphries noted that Fields was pleasant, cooperative, alert, obese, in no distress, and related appropriately to him while having the ability to answer questions appropriately. (R. at 223.) Dr. Humprhries's examination revealed that Fields's neck had a normal range of motion, and he did not note any abnormalities. (R. at 223.) With respect to Fields's back, Dr. Humphries noted that it had a normal range of motion without significant kyphosis, and there was no scoliosis or paraverterbral muscle spasms. (R. at 223.) However, while the straight leg raise was negative lying or sitting, there was pain elicited during the maneuver on the right knee and tibula-fibula region. (R. at 223.) Fields had a full range of motion in her arms without tenderness, heat, swelling or deformity, but there was moderate tenderness to palpation over the volar forearm from the wrist to near the elbow. (R. at 223.) Dr. Humphries further noted that Tinel's sign was negative bilaterally. (R. at 223.) There was no tenderness to palpation of the tenar or hypothenar areas of either hand. (R. at 224.) Fields's range of motion in her lower extremities was reduced in both hips and "slightly reduced" on the right knee. (R. at 224.) The lower extremities were without further limitations and did not show tenderness, heat, swelling or joint deformity. (R. at 224.) Dr. Humphries noted that there was moderate tenderness to palpitation of the plantar aspect of the right mid-foot. (R. at 224.) Additionally, Fields's lower extremities revealed no significant venous stasis changes, the darsalis pedis pulses were one plus and equal, the posterior tibials were thready bilaterally and foot perfusion was adequate bilaterally. (R. at 224.)

Dr. Humphries observed that Fields got on and off the examination table without difficulty. (R. at 224.) Her grip, radial, median and ulnar nerve functions

were intact bilaterally. (R. at 224.) Fields's gait was mildly antalgic on the right side due to right knee discomfort, she was able to perform a heel and toe stand, but could not perform a heel or toe walk because of right knee and foot discomfort. (R. at 224.) The Romberg was associated with some waddling, but Dr. Humphries stated it was "basically negative." (R. at 224.) Fields was able to perform fine manipulation adequately. (R. at 224.) Dr. Humphries noted that Fields performed the tandem gait adequately, but with the occasional miscue. (R. at 224.) Dr. Humphries indicated that Fields could bear weight on each leg, but that she could only do so briefly on the right leg. (R. at 224.) Further, Dr. Humphries found that Fields's strength was normal within all of her extremities. (R. at 224.) Dr. Humphries did not discover any specific muscle wasting; however, he noted that it was difficult to ascertain because of excess adipose tissue in the lower extremities. (R. at 224.) Moreover, Dr. Humphries opined that there was no motor loss in the lower extremities and there was mild hypersensitivity to palpation on a "stocking-glove distribution" of the right lower extremity from the knee to the toes. (R. at 224.) Fields's vision, hearing, lungs and heart were all found to be without abnormalities. (R. at 224.)

Mentally, Dr. Humphries observed that Fields was alert and oriented in all spheres, her speech was intelligible and sustained, and there was no aphasia. (R. at 225.) According to Dr. Humphries, Fields behaved appropriately for the examination and her thought and behavior content were within normal limits. (R. at 225.) Dr. Humphries opined that Fields's intelligence was normal, her memory was intact for recent and remote events, her affect and grooming were appropriate and she should be able to handle her own funds. (R. at 225.)

Dr. Humphries diagnosed Fields with posttraumatic degenerative joint disease of the right knee with chondromalasia of patella, peripheral neuropathy, posttraumatic right lower extremity, chronic shoulder strain, obesity and plantar fasciitis of the right foot. (R. at 225.) Dr. Humphries opined that Fields would be limited to sitting six hours in an eight-hour workday and standing or walking two hours in an eight-hour workday. (R. at 225.) However, Dr. Humphries stated that with several months of appropriate physical therapy, pain management modalities and orthotics, Fields should be able to stand and walk for six hours out of an eight-hour workday. (R. at 225.) Dr. Humphries found that Fields could frequently lift items weighing up to 15 pounds and occasionally lift items weighing up to 25 pounds.[6] (R. at 225.) Dr. Humphries opined that Fields would only occassionally be able to climb, kneel or crawl; she should avoid heights and hazards; and he noted no restrictions on stooping, crouching or exposure to fumes. (R. at 225.)

Joseph Leizer, Ph.D., a state agency psychologist, completed a Psychiatric Review Technique form, ("PRTF"), on March 21, 2006. (R. at 227-240.) Leizer indicated that there was evidence of an affective disorder, namely depressive disorder, not otherwise specified, but that Fields's impairments were not severe and did not satisfy diagnostic criteria. (R. at 227, 230.) Additionally, Leizer found there was a coexisting non-mental impairment that required referral to another medical specialty. (R. at 227.) Leizer opined that Fields would not experience any

---

[6] Dr. Humphries's report stated that Fields could lift 15 pounds occasionally and 25 pounds frequently, (R. at 225), however, the court assumes this is a typographical error, as it is more logical reversed.

limitation in activities of daily living, maintaining social functioning, concentration, persistence or pace, and there was no evidence of episodes of decompensation. (R. at 237.) Leizer found that Fields's disability allegations were not credible because her mental allegations were not severe and she could perform the mental demands of all levels of work. (R. at 240.)

A Physical Residual Functional Capacity Assessment, ("PRFC"), was completed by Dr. Shirish Shahane, M.D., on April 17, 2006. (R. at 241-48.) Dr. Shahane listed degenerative joint disease of the right knee as his primary diagnosis. (R. at 241.) Dr. Shahane opined that Fields could occasionally lift and/or carry items weighing up to 20 pounds; frequently lift and/or carry items weighing up to 10 pounds; sit, stand and/or walk for six hours out of an eight-hour workday; and her abilities to push and pull were not limited. (R at 242.) Dr. Shahane found that Fields could never climb ladders, ropes or scaffolds, but she could occasionally climb ramps and stairs, balance, stoop, kneel, crouch and crawl. (R. at 243.) Dr. Shahane did not note any visual, manipulative or communicative limitations. (R. at 243-44.) Dr. Shahane found that Fields should avoid even moderate exposure to hazards, but did not note any other environmental limitations. (R. at 244.) Dr. Shahane found Fields's statements to be partially credible. (R. at 248.)

On May 20, 2004, Fields presented to Stone Mountain Health Services, ("SMHS"), for treatment following her motor vehicle accident, and was treated by Dr. Candace Bellamy. (R. at 268-69.) She reported that she was having difficulty using her crutches, was unable to put any pressure on her knee, and that while she

was having trouble with both knees, her right knee was worse. (R. at 268.) Fields's companion reported to Dr. Bellamy that Fields had been mentally alert and had not experienced difficulties with memory or sleep. (R. at 268.) Fields was in a wheelchair while at the office. (R. at 268.) Dr. Bellamy assessed Fields with right knee swelling and effusion and noted that Fields was scheduled for an MRI. (R. at 268.) Dr. Bellamy prescribed Xanax to help Fields sleep and Lortab for pain. (R. at 268.)

On June 30, 2004, prior to her ACL reconstruction surgery, Fields returned to SMHS and was treated by Dr. Bellamy. (R. at 266-67.) Fields reported that she had a complete ACL tear, and that while she felt better she still had headaches, which she opined were caused by hitting her head on the windshield during her automobile accident. (R. at 266.) Furthermore, Fields expressed frustration over having to be off work and the financial strains it had caused. (R. at 266.) Fields denied being depressed, but stated that she was anxious at times and requested a refill of Xanax. (R. at 266.) Fields further denied that she had experienced numbness, weakness, loss of consciousness or slurred speech. (R. at 266.) On examination, Fields was found to be alert and oriented, and it was noted that her scalp was tender to palpitation over the right temple. (R. at 266.) Fields was diagnosed with anxiety and headaches, status post motor vehicle accident. (R. at 266.) Dr. Bellamy stated that she was going to schedule a skull series and head CT scan. (R. at 266.) Fields was prescribed 15 pills of Xanax, with no refills, to be taken as needed. (R. at 266.)

Fields presented to Carol Looney, FNP, at SMHS, on December 28, 2004, to be treated for a sore-throat, green rhinorrhea and an earache. (R. at 263-65.) Fields reported that in the morning she "burp[ed] up a lot and it taste[d] like iron." (R. at 263.) Moreover, she was experiencing heartburn and indigestion. (R. at 263.) Looney observed Fields to be alert and oriented, pleasant, in no acute distress and ambulating without difficulty. (R. at 263.) Looney noted that Fields was congested, had some abdominal tenderness, there was no edema in the lower extremities and she was without further abnormalities. (R. at 263.) Fields was diagnosed with abdominal pain, gastrointestinal reflux disorder, ("GERD"), acute pharyngitis and hyperlipidemia. (R. at 263.) Looney stated she was going to send Fields to the lab for testing and put her on Augmentin, Prevacid and Medent. (R. at 263.)

On January 7, 2005, Fields presented to Looney at SMHS to be treated for bilateral earaches. (R. at 261-62.) Fields reported having blood in both ears and bright yellow fluid exuding from the left; additionally, she claimed that she could not hear very well. (R. at 261.) Fields also claimed she suffered from sneezing, watery and itchy eyes and a runny nose, but attributed those symptoms to living in a new home. (R. at 261.) Looney observed Fields to be alert and oriented and in no acute distress, with no edema in the lower extremities. (R. at 261.) Looney diagnosed Fields with otalgia and allergic rhinitis and prescribed Allegra with Nasacort nasal spray. (R. at 261.)

On June 9, 2005, Fields presented to Looney at SMHS for a follow-up visit. (R. at 258-59.) Fields reported that she stopped taking Zocor because it gave her headaches. (R. at 258.) Fields claimed to be depressed, tearful, "kind of down," snappy and hateful; also, she stated that she did not feel like doing anything. (R. at 258.) Looney observed Fields to be alert and oriented and in no acute distress. (R. at 258.) Looney noted that Fields was tearful at times and made good eye contact during discussions. (R. at 258.) Looney diagnosed Fields with hyperlipidemia, menopause and depression. (R. at 258.) Looney discussed with Fields the importance of starting a healthy diet and prescriped Lexapro. (R. at 258.) On June 24, 2005, Fields returned for a follow-up visit to discuss the treatment of her depression. (R. at 257.) Fields reported that she liked the medication Lexapro and was doing well with it. (R. at 257.) Fields claimed that she had been trying to follow her diet, did not take Zocor because it caused headaches and requested that her lipids be checked. (R. at 257.) Looney observed Fields to be alert and oriented, pleasant and in no acute distress. (R. at 257.) Fields was diagnosed with hyperlipidemia, her current treatment was continued and she was sent to have her lipids checked. (R. at 257.)

On November 14, 2005, Fields returned to SMHS reporting knee, foot and ankle pain. (R. at 254-55.) Fields claimed to have nerve damage in her ankle and pain in the arch of her foot. (R. at 254.) Further, Fields complained of weight gain, and it was noted that she had gained 14 pounds in two months. (R. at 254.) There was no edema in the extremities and a knee exam showed no obvious deformity, redness or swelling. (R. at 254.) Fields had a full range of motion in her knee, good circulation and crepitus with movement of the knee. (R. at 254.)

Looney diagnosed Fields with knee and ankle pain, malaise and hyperlipidemia. (R. at 254.)  Looney sent Fields to the lab for a work-up, discussed exercises to strengthen the arch of her foot and instructed her to follow up with Dr. Huff about her knee.  (R. at 254.)


On June 13, 2006, Fields presented to SMHS and was seen by Looney for a follow-up, and also reported soreness and pain in her right breast, which had been occurring for a year.  (R. at 251-52.)  Fields reported that she was doing well with regard to her depression and had not taken Lexapro for a year.  (R. at 251.)  A breast examination did not reveal any masses or nipple discharge, but Looney suggested a mammogram be taken of Fields.  (R. at 251.)  Fields requested estrogen and Looney explained the risks of taking the drug, including cancer spreading faster.  (R. at 251.)  Despite the risks, Fields wanted the medication, claiming to be moody and irritable.  (R. at 251.)


On September 21, 2006, Fields presented to SMHS for a follow-up visit.  (R. at 249-50.)  Fields claimed that her mammogram revealed an abnormality that required follow-up treatment.  (R. at 249.)  Fields stated that she quit taking Lexapro because it gave her headaches, but claimed she needed an alternative medication because she was irritable and moody.  (R. at 249.)  Looney noted that Fields was pleasant, alert and oriented and in no acute distress.  (R. at 249.)  Fields was diagnosed with acute sinusitis, hyperlipidemia, hyperglycemia and allergic rhinitis.  (R. at 249.)  Looney prescribed Prozac, Zyrtec and Nasonex.  (R. at 249.)

On October 19, 2006, Fields presented to Looney at SMHS for another follow-up visit. (R. at 353-54.) Looney noted that she had prescribed Prozac to Fields on the September 21, 2006, visit and requested that Fields return two weeks from that date to assess the medication, but Fields missed her appointment. (R. at 353.) Fields reported that she was doing "really well" with Prozac and was feeling "much better." (R. at 353.) Looney noted that Fields had an abnormality on her mammogram, which would require spot compressions and an ultrasound, but the Women's Health Center was waiting on the results of x-rays prior to performing those procedures. (R. at 353.) Fields alleged that she was suffering from pain in her right hand when performing certain activities, such as mopping or sewing. (R. at 353.) Further, Fields claimed that she had to prop her hand on a pillow at night to prevent it from becoming numb and that, at times, the pain awakened her and hurt all the way to her elbow. (R. at 353.) Further, Fields claimed that she was experiencing pain across the top of her back when she stood for an extended period of time or mopped. (R. at 353.) Fields also claimed to have trouble with both knees and was told in the past that she had arthritis in her knees, but denied chest pain, palpitation, headaches, dizziness, nausea, vomiting, melena, rectal bleeding or urinary trouble. (R. at 353.) Looney observed Fields to be pleasant, alert and oriented and in no acute distress. (R. at 353.) An examination revealed that there was no edema in the lower extremities and while Fields's knee had crepitus, there was no obvious deformity, redness or swelling. (R. at 353.) Looney noted that Fields had tenderness across the thoracic portion of the upper part of the back, but Looney did not feel any muscle spasms. (R. at 353.) Looney diagnosed Fields with an abnormality in the breast, probable carpal tunnel and upper back pain. (R.

33

at 353.)  Looney prescribed Cataflam, glucosamine and Chondroitin, and directed Fields to wear a hand brace, apply heat to her back and take a vitamin B-6 supplement.  (R. at 354.)  Additionally, Looney told Fields of exercises to strengthen the muscles in her back and around her knees.  (R. at 354.)

Fields returned to SMHS on November 16, 2006, for a follow-up visit, and reported that for the two weeks prior to the visit she had been tearful, angry and easily agitated.  (R. at 355-57.)  Fields reported that during an argument with her "significant other," she attacked him, which caused him to call the police.  (R. at 356.)  Fields stated that she had done well with Prozac, opining that it worked when she took it.  (R. at 356.)  Fields disclosed that she was sexually assaulted by a cousin when she was younger.  (R. at 356.)  Fields also stated that she had never seen a psychiatrist, had not been diagnosed as bipolar and had not experienced suicidal or homicidal ideations.  (R. at 356.)  The physical examination was unremarkable and Looney observed Fields to be alert and oriented, in no acute distress and tearful while talking about her situation and past.  (R. at 356.)  Fields was diagnosed with hyperglycemia, depression and anxiety.  (R. at 356.)  Looney had Fields fill out a questionnaire regarding bipolar disorder, opining that she might have a component of manic-depressive disorder; as such, she advised Fields to stop taking Prozac.  (R. at 357.)

Fields presented to SMHS on December 1, 2006, reporting that her right hand shook, tingled and went numb, and she claimed that when these symptoms occurred it felt as if they were traveling to her neck.  (R. at 358-59.)  Fields alleged

that these symptoms had occurred over the past two months and had recently worsened; also, she stated that her hand was weak. (R. at 359.) Further, Fields stated that she had rectal bleeding a week prior to the visit, and when she went to the emergency room they did not see hemorrhoids and her Hemoccult was negative. (R. at 359.) Fields reported that lithium helped her nervousness and anxiousness, but that she was still depressed. (R. at 359.) Looney observed Fields to be pleasant, alert and oriented and in no acute distress. (R. at 359.) Looney noted that Fields's hand had a tremor when she tried to hold it still and had decreased grip strength, but she still had good use of her arm. (R. at 359.) The examination was otherwise unremarkable. (R. at 359.) Looney prescribed Celexa, made plans to send Fields for a colonoscopy, refilled her lithium and stated that she was going to send her for a nerve conduction study to determine the cause of the trouble with her hand. (R. at 359.)

On December 28, 2006, Fields presented to SMHS for a follow-up. (R. at 360-61.) Fields reported that Celexa was helping, but she felt that it could do better, stating that it decreased her libido. (R. at 361.) She stated that she was still feeling down, but her moodiness was better. (R. at 361.) However, she claimed that she lacked energy, and Looney noted that her thyroid was normal. (R. at 361.) Looney observed Fields to be alert and oriented, pleasant and in no acute distress. (R. at 361.) A physical examination was unremarkable. (R. at 361.) Looney diagnosed Fields with depression, anxiety and menopause. (R. at 361.) Looney maintained Fields's current level of lithium, but increased her dose of Celexa. (R. at 361.)

On March 6, 2007, Fields presented to SMHS for a follow-up visit to assess her depression and anxiety. (R. at 362-63.) Fields expressed an interest in trying Wellbutrin in conjunction with Celexa to boost her libido. (R. at 363.) Fields reported that "she ha[d] been doing well." (R. at 363.) Fields was found to be pleasant, alert and oriented and in no acute distress. (R. at 363.) The physical examination was unremarkable. (R. at 363.) Fields was diagnosed with allergic rhinitis, depression and anxiety. (R. at 363.) Looney suggested that Fields continue her medications at their current dosages and prescribed Wellbutrin. (R. at 363.)

Dr. Richard Surrusco, M.D., a state agency physician, completed a PRFC on October 4, 2006. (R. at 327-332.) Dr. Surrusco listed a primary diagnosis of posttraumatic degenerative joint disease of the knee, a secondary diagnosis of obesity and additional diagnoses of chronic shoulder pain and peripheral neuropathy. (R. at 327.) Dr. Surrusco opined that Fields could occasionally lift and/or carry items weighing up to 20 pounds; frequently lift and/or carry items weighing up to 10 pounds; sit, stand and/or walk for six hours out of an eight-hour workday; and her abilities to push and pull were unlimited. (R. at 328.) Dr. Surrusco found that Fields could occasionally climb, kneel, crouch and crawl, and could frequently balance and stoop. (R. at 329.) Dr. Surrusco did not note any visual, manipulative, communicative or environmental restrictions. (R. at 330.) Dr. Surrusco found Fields's statements to be partially credible, and he opined that

her conditions would not prevent her from returning to her previous work as a telemarketer. (R. at 332.)

On October 5, 2006, Julie Jennings, Ph.D., a state agency psychologist, completed a PRTF, in which she noted that Fields suffered from an affective disorder, namely depression, which was not severe. (R. at 333-45.) Jennings opined that Fields would experience mild limitations in activities of daily living, maintaining social functioning, concentration, persistence or pace, and there was no evidence of episodes of decompensation. (R. at 343.) Jennings found Fields's statements to be partially credible and noted there was no evidence of a severe mental impairment. (R. at 345.)

Fields presented to Patrick Farley, Ed.D., LPC, NCC, on November 29, 2006, after being referred by Looney. (R. at 366-67.) Farley noted that Fields reported having pain in various parts of her body and depression. (R. at 366.) Fields claimed that she had nerve problems and was "edgy." (R. at 366.) Fields alleged that stress and medical problems prevented her from working and taking care of her home. (R. at 366.) Farley noted that the significant stressors in Fields's life were physical and psychological symptoms, as well as finances. (R. at 366.) Farley noted that Fields listed the following symptoms: dysphoria, social withdrawal, anergia, memory problems, diminished concentration, a short attention span, increased irritability, low frustration tolerance, initial insomnia and intermittent wakening, feelings of helplessness and hopelessness and increased nervousness. (R. at 366.) Fields also verbalized low self-esteem, and while she

denied suicidal ideations, she reported that she often wondered if she would be better off dead.  (R. at 366.)  Farley noted that Fields had been divorced for four years, after having been married for 13 years, and ended a five-year relationship one month prior to the visit.  (R. at 367.)  Fields stated that she lived with her mother and stepfather, indicating that she got along well with each of them.  (R. at 367.)  Fields claimed that her childhood memories are bad due to her parent's problems and absences.  (R. at 367.)  Fields disclosed that she did not exercise, noting that she mainly spent her days '"watching television and doing nothing."' (R. at 367.)


Farley found Fields to be cooperative and to have an intelligence level in the low average range.  (R. at 367.)  He noted that Fields did not have a history of delusions or hallucinations, had a mildly impaired memory and concentration, had a diminished frustration tolerance and appeared significantly depressed and anxious.  (R. at 367.)  Farley diagnosed Fields with major depression, single episode, mild, he deferred on Axis II and listed medical conditions of possible carpal tunnel and knee and foot pain of unknown etiology.  (R. at 367.)  Farley assessed Fields with a then-current Global Assessment of Functioning, ("GAF"), score of 65.[7]  (R. at 367.)  Farley opined that Fields needed further evalutation to

---

[7] The GAF scale ranges from zero to 100 and "[c]onsider[s] psychological, social, and occupational functioning on a hypothetical continuum of mental health-illness." DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS FOURTH EDITION, ("DSM-IV"), 32 (American Psychiatric Association 1994).

A GAF of 61-70 indicates that "[s]ome mild symptoms ... OR some difficulty in social, occupational, or school functioning ... , but generally functioning pretty well, has some meaningful interpersonal relationships." DSM-IV at 32.

determine the validity of a bipolar mood disorder diagnosis. (R. at 367.) Farley recommended that Fields participate in psychotherapy on a biweekly basis for at least four months and continue on psychoactive medication as prescribed by Looney. (R. at 367.)

Fields returned for a counseling session with Farley on December 13, 2006. (R. at 368.) Farley noted that Fields was oriented in all spheres, cooperative, neat, clean, not restless, calm, dressed and maintaining an appropriate behavior. (R. at 368.) However, Fields stated that she had not experienced a change in symptoms since her initial visit, and she reported that she experienced sleep disturbance, anergia, anhedonia, crying spells and decreased concentration. (R. at 368.) Fields denied any "high risk indicators," such as suicidal ideations and thoughts. (R. at 368.) Farley opined that Fields should continue with her current treatment and reiterated her then-current GAF score of 65, but noted that her highest GAF score in the past year was 80.[8]

Fields was scheduled to return to Farley's office on December 28, 2006, but called and rescheduled for January 3, 2007, and called on that date stating she would call back to reschedule. (R. at 369.) Fields failed to call and reschedule and Farley noted that she did not return his telephone calls. (R. at 369.) Farley stated that Fields only complying with two visits hampered his ability to properly

_____

[8] A GAF of 71-80 indicates that, "[i]f some symptoms are present, they are transient and expectable reactions to psychosocial stressors...; no more than slight impairment in social, occupational, or school functioning...." DSM-IV at 32.

evaluate her, and, despite his attempts to get her to return to counseling, she was unresponsive. (R. at 365.)

On April 25, 2007, Fields presented to Cumberland Mountain Community Services, ("CMCS"), and was treated by Sharon Hall-Anderson, L.C.S.W., M.S.W. (R. at 372-76.) Hall-Anderson diagnosed Fields with major depressive disorder, recurrent, deferred on axis II and noted allergies for physical disorders. (R. at 372.) Hall-Anderson assessed Fields with a then-current GAF score of 50.[9] (R. at 372.) Fields was observed to be well-groomed, calm, cooperative and to exhibit a flat affect. (R. at 373.) Hall-Anderson found that Fields was goal-directed and depressed. (R. at 373.) Fields reported that she had been experiencing moderate insomnia, mild crying spells, mild irritability, decreased energy and increased appetite. (R. at 373-74.) Hall-Anderson noted that Fields's orientation was intact, but her memory, concentration, insight and judgment were impaired or limited. (R. at 374.) Fields claimed that she had never been hospitalized for psychiatric care, nor had she received outpatient psychiatric care. (R. at 374.) Fields stated that she wanted to work on her mood swings, depression and relationship issues. (R. at 375.)

Hall-Anderson also completed a crisis evaluation, in which Fields reported that she had been arguing with her fiancé, and she claimed to have been

---

[9] A GAF of 41-50 indicates "[s]erious symptoms ... OR any serious impairment in social, occupational, or school functioning ...." DSM-IV at 32.

experiencing depression and anxiety. (R. at 387-90.) Fields stated that she did not plan to harm herself, but claimed in the past she had thought about it and formulated a plan. (R. at 387.) Fields alleged that she still had medical problems related to a motor vehicle accident and stated that she was not receiving adequate medical attention. (R. at 387.) Fields said she was excessively tired and had experienced sleep problems. (R. at 387.) Hall-Anderson discussed ways for Fields and her fiancé to improve their relationship. (R. at 387.)

Fields returned to CMCS for a counseling session with Hall-Anderson on May 14, 2007. (R. at 391.) Hall-Anderson observed Fields to be displaying the following mental status factors: flat affect, depressed mood, cooperative, verbal, oriented in all spheres, not experiencing hallucinations, delusions or suicidal or homicidal ideations, exhibiting adequate self-care and improved insight and judgment. (R. at 391.) Fields reported that her relationship issues had not improved, indicating that she argued with her fiancé when she tried to get him to accompany her to counseling. (R. at 391.) Fields discussed issues relating to her father and ex-husband and stated that she was not a priority to her fiancée. (R. at 391.) Fields stated that if she was not financially dependent upon her fiancée, she would leave him. (R. at 391.) Fields claimed that she was having a bad day and everything was bothering her. (R. at 391.)

Fields presented to Hall-Anderson again on May 24, 2007, and demonstrated the following mental status: flat affect, depressed mood, tearful at times, red puffy eyes, cooperative, verbal, oriented in all spheres, impaired memory and

concentration at times, adequate self-care, fair insight and judgment, and Fields denied suicidal or homicidal ideations. (R. at 392.) Fields claimed that things had been worse than normal, and she stated that she had argued with her fiancé more often than usual. (R. at 392.) Fields discussed the crises that had occurred prior to the appointment and Hall-Anderson expressed the importance of continued treatment. (R. at 392.)

Hall-Anderson completed a Medical Assessment Of Ability To Do Work-Related Activities (Mental) on May 24, 2007. (R. at 377-78.) Hall-Anderson opined that Fields's abilities to follow work rules and function independently were fair, while she had poor or no abilities to deal with work stresses and maintain attention and concentration. (R. at 377.) Hall-Anderson noted that Fields had poor concentration at times. (R. at 377.) Hall-Anderson stated that she based her opinions on that fact that Fields had an increase in depression and anxiety, which she found caused a decrease in attention and concentration, and Fields reported to her that she could not handle stress well. (R. at 377.) Hall-Anderson opined that Fields had a fair ability to understand, remember and carry out complex job instructions and a good ability to understand, remember and carry out simple job instructions; Hall-Anderson explained that Fields had an average intellect and poor short-term memory, stating that she was forgetting details from two days prior. (R. at 278.) Hall-Anderson found that Fields had a good ability to maintain personal appearance and demonstrate reliability and fair abilities to behave in an emotionally stable manner and relate predictably in social situations. (R. at 378.) Continuing, Hall-Anderson stated that Fields's personal hygiene was always good, she was reliable about keeping appointments, but due to depression and anxiety it

was difficult to predict her emotional behavior on a daily basis or in social situations. (R. at 378.) Finally, Hall-Anderson opined that Fields could manage her benefits in her best interest. (R. at 378.)

Yvette Taylor, a case manage with CMCS, completed a Medical Assessment Of Ability To Do Work-Related Activities (Mental) on June 11, 2007. (R. at 380-81.) Taylor opined that Fields had a fair ability to follow work rules, noting that she had poor concentration at times, and she stated that Fields often forgot what she was talking about in the middle of the conversation. (R. at 380.) Taylor stated that she could not comment on Fields's work activities or behaviors because she had not observed them. (R. at 380.) Taylor found that Fields had poor or no ablity to understand, remember and carry out complex or detailed job instructions and had a fair ability to understand, remember and carry out simple job instructions. (R. at 381.) The basis for Taylor's opinion came from Fields stating that she had a poor memory and could not concentrate on or remember job instructions. (R. at 381.) Taylor found that Fields had a good ability to maintain personal appearance and fair abilities to behave in an emotionally stable manner, relate predictably in social situations and demonstrate reliability. (R. at 381.) Taylor explained that Fields was tearful when arriving at the office and claimed to become angry easily. (R. at 381.) Taylor found that Fields could manage benefits in her own best interest if they are awarded. (R. at 381.)

On May 15, 2007, Fields presented to Tri-County Health Clinic, ("TCHC"), complaining of pain at the bottom of her feet, both knees and ankle, edema in the

right ankle, which was worsened by standing, and right arm pain.  (R. at 393-94.)
The rest of the notes from this visit are illegible.  (R. at 394.)  On May 29, 2007,
Fields returned to TCHC with similar complaints; however, the treatment notes are
once again illegible.  (R. at 394.)  On June 27, 2007, the physician at TCHC spoke
with a podiatrist, who stated that Fields's ankle injury was old and an x-ray and
possibly a brace would be sufficient, stating that surgery was not an option.  (R. at
395.)  It was further noted that Fields called to request Lortab.  (R. at 395.)


On June 5, 2007, Fields presented to Dr. Samuel Scott, D.P.M., after being
referred by TCHC to have her ankle and foot evaluated.  (R. at 396-98.)  Fields
reported that she had experienced right foot and ankle pain for six years, and she
opined that she may have initially hurt her ankle when she was a teenager or when
she was in prison.  (R. at 396.)  Fields reported that she had the following ailments:
ringing in her ears, sinus problems, high cholesterol, swelling in her ankles and
feet, leg pain, bloody and black stools, abdominal pain, excessive thirst, ovarian
cancer, easy bruising, permanent nerve damage in the right leg, difficulty sleeping,
depression and anxiety.  (R. at 396.)  Dr. Scott observed Fields to be alert and
oriented in all spheres, and noted that she gave normal responses.  (R. at 396.)  Dr.
Scott found that Fields had a decreased range of motion below her ankle and that
the right was slightly worse than the left.  (R. at 397.)  Fields showed pain on
palpitation to the right Achilles tendon, right tibialis anterior tendon and posterior
tibial tendon.  (R. at 397.)  Dr. Scott noted that Fields had a pronated foot type with
loss of arch below the right slightly greater than left and mild rearfoot valgus with
the right being slight greater than the left.  (R. at 397.)  Dr. Scott diagnosed Fields

with right Achilles tendonitis, right tibialis anterior tendonitis and right posterior tibial tendonitis.  (R. at 397.)

Fields presented to the University of Virginia to have a neurology study to determine the cause of her right hand numbness and tingling on March 8, 2007.  (R. at 406-07.)  It was noted that the studies were normal and there was no evidence of electrophysiological evidence for a right median neuropathy at the wrist or a right cervical radiculopathy.  (R. at 407.)

## III. Analysis

The Commissioner uses a five-step process in evaluating SSI and DIB claims.  *See* 20 C.F.R. §§  404.1520, 416.920 (2009); *see also Heckler v. Campbell*, 461 U.S. 458, 460-62 (1983); *Hall v. Harris*, 658 F.2d 260, 264-65 (4th Cir. 1981).  The  process requires the Commissioner to consider, in order, whether a claimant 1) is working; 2) has a severe impairment; 3) has an impairment that meets or equals the requirements of a listed impairment; 4) can return to her past relevant work; and 5) if not, whether she can perform other work.  *See* 20 C.F.R. §§ 404.1520, 416.920 (2009).   If the Commissioner finds conclusively that a claimant is or is not disabled at any point in the process, review does not proceed to the next step.  *See* 20 C.F.R. §§ 404.1520(a), 416.920(a) (2009).

Under this analysis, a claimant has the initial burden of showing that she is unable to return to her past relevant work because of her impairments. Once a claimant establishes a prima facie case of disability, the burden shifts to the Commissioner. To satisfy this burden, the Commissioner must then establish that the claimant has the residual functional capacity, considering the claimant's age, education, work experience and impairments, to perform alternative jobs that exist in the national economy. *See* 42 U.S.C.A. §§ 423(d)(2)(A), 1382c(a)(3)(A)-(B) (West 2003 & Supp. 2009); *McLain v. Schweiker*, 715 F.2d 866, 868-69 (4th Cir. 1983); *Hall*, 658 F.2d at 264-65; *Wilson v. Califano*, 617 F.2d 1050, 1053 (4th Cir. 1980).

By decision dated October 25, 2007, the ALJ denied Fields's claims. (R. at 13-28.) The ALJ found that Fields met the insured status requirements of the Act through December 31, 2008, and had not engaged in substantial gainful activity since May 14, 2004, her alleged onset date of disability. (R. at 19.) The ALJ found that Fields had the following severe combination of medically determinable impairments: obesity, osteoarthritis of the right knee, foot and ankle, status-post right knee surgery for an anterior cruciate ligament, ("ACL"), tear, possible carpal tunnel syndrome of the right elbow to wrist and depression. (R. at 19.) However, the ALJ found that the impairments, individually or in combination, did not meet or medically equal one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. at 20.) The ALJ found that Fields had the residual functional capacity to perform sedentary work, i.e., no prolonged or frequent standing or walking and no lifting or carrying items weighing more than 10 pounds. (R. at 25.) Further, the ALJ stated that Fields must be allowed to alternate sitting and standing "a couple of times per workday more than would be allowed by scheduled breaks."

(R. at 25.)  It was determined that Fields could never climb, but could occasionally balance, kneel, crawl and stoop.  (R. at 25.)  The ALJ found that she needed an air-conditioned environment and she should not be in a position that required repetitive use of her right hand for manipulation.  (R. at 25.)  Additionally, the ALJ found that Fields was limited to simple, non-complex tasks.  (R. at 26.)  The ALJ found that Fields was unable to perform any of her past relevant work.  (R. at 26.)  Further, the ALJ found that transferability of job skills was not important because using the Medical-Vocational Rules as a framework supported a finding that Fields was "not disabled" regardless of whether she had transferable job skills.  (R. at 27.)  After considering Fields's age, education, work experience and residual functional capacity, the ALJ determined that there were jobs that exist in significant numbers in the national economy that she could perform.  (R. at 27.)  Thus, the ALJ found that Fields was not under a disability as defined by the Act.  (R. at 28.)  *See* 20 C.F.R. §§ 404.1520(g) and 416.920(g).

Fields argues that the ALJ's decision is not supported by substantial evidence. (Plaintiff's Brief In Support Of Motion For Summary Judgment, ("Plaintiff's Brief"), at 8-19)  Specifically, Fields argues that the ALJ did not properly consider the effects of her right arm and hand impairment.  (Plaintiff's Brief at 9-11.)  Additionally, Fields asserts that the ALJ "played doctor" when determining the effects of her right extremity impairment, due to the fact, that the physical residual functional capacity was determined by the ALJ rather than by a physician.  (Plaintiff's Brief at 11-12.) This, Fields argues, is because the ALJ based her opinion on medical findings that were not reviewed or examined by a medical expert.  (Plaintiff's Brief at 12.)  Also, Fields claims that the ALJ

substituted her opinion for that of a trained professional when determining her mental residual functional capacity.  (Plaintiff's Brief at 12-19.)

As stated above, the court's function in this case is limited to determining whether substantial evidence exists in the record to support the ALJ's findings. This court must not weigh the evidence, as this court lacks authority to substitute its judgment for that of the Commissioner, provided his decision is supported by substantial evidence.  *See Hays*, 907 F.2d at 1456.  In determining whether substantial evidence supports the Commissioner's decision, the court also must consider whether the ALJ analyzed all of the relevant evidence and whether the ALJ sufficiently explained her findings and her rationale in crediting evidence. *See Sterling Smokeless Coal Co. v. Akers*, 131 F.3d 438, 439-40 (4th Cir. 1997).

Thus, it is the ALJ's responsibility to weigh the evidence, including the medical evidence, in order to resolve any conflicts which might appear therein. *See Hays,* 907 F.2d at 1456; *Taylor v. Weinberger*, 528 F.2d 1153, 1156 (4th Cir. 1975).  Specifically, the ALJ must indicate that she has weighed all relevant evidence and must indicate the weight given to this evidence.  *See Stawls v. Califano*, 596 F.2d 1209, 1213 (4th Cir. 1979.)  While an ALJ may not reject medical evidence for no reason or for the wrong reason, *see King v. Califano*, 615 F.2d 1018, 1020 (4th Cir. 1980), an ALJ may, under the regulations, assign no or little weight to a medical opinion, even one from a treating source, based on the factors set forth at 20 C.F.R. §§ 404.1527(d), 416.927(d), if she sufficiently explains his rationale and if the record supports her findings.

The court will first address Fields's claim that the ALJ's decision is not supported by substantial evidence, due to the fact that the ALJ did not properly consider the effects of her right arm and hand impairment. (Plaintiff's Brief at 9-11.) Fields argues that limitations of the use of her hands and fingers preclude her from performing unskilled, sedentary jobs. (Plaintiff's Brief at 11.) Further, Fields argues that the ALJ was not qualified to the make the physical residual functional capacity determination, and there were no medical opinions to corroborate those findings. (R. at 11-12.)

Fields testified at the ALJ hearing that she was right-handed and that the trouble with her right hand and arm required her to sleep with it on a pillow. (R. at 423-24.) The ALJ found that Fields had the physical residual functional capacity to perform sedentary work; she must be able to alternate sitting and standing "a couple of times per workday" more than usual; she can never climb, but can occasionally balance, kneel, crawl and stoop; and she needs an air-conditioned environment. (R. at 25.) With regard to Fields's right, upper-extremity, the ALJ found that she had possible carpal tunnel syndrome of the right elbow to wrist, (R. at 19), and found that she should not be in a position that required repetitive use of her right hand for manipulation, such as, doing the same tasks repetitively on a production schedule. (R. at 25.) Further, in part due to pain, she was limited to simple, non-complex tasks. (R. at 26.)

During a consultative examination on March 14, 2006, Dr. Humphries found that Fields had a full range of motion in her arms without tenderness, heat, swelling or deformity, but noted there was moderate tenderness to palpation over the volar forearm from the wrist to near the elbow. (R. at 223.) Dr. Humphries

noted that there was "no tenderness to palpitation of the thenar or hypothenar areas of either hand."  (R. at 224.)  Moreover, Dr. Humphries observed that Fields was able to adequately perform fine manipulation.  (R. at 224.)  Dr. Humphries did not find any diagnoses relevant to Fields's right arm, wrist or hand, but found that she suffered from chronic right shoulder strain.  (R. at 225.)  Dr. Humphries did not note any manipulative limitations, or other limitations specific to her right, upper-extremity.  (R. at 225.)

Dr. Shahane, completed a PRFC on April 17, 2006, (R. at 241-48), and he also did not list any diagnoses related to Fields's right, upper-extremity.  Dr. Shahane listed degenerative joint disease of the right knee as his primary diagnosis.  (R. at 241.)  Dr. Shahane opined that Fields could occassionally lift and/or carry items weighing up to 20 pounds, frequently lift and/or carry items weighing up to 10 pounds, and her abilities to push and pull were not limited.  (R at 242.)  Furthermore, he did not list any manipulative limitations.  (R. at 243.)

Fields complained of, and was treated for, problems with her right, upper-extremity to SMHS, with the first documented complaint occurring on October 19, 2006.  (R. at 353.)  Fields alleged that she was suffering from pain in her right hand when performing certain activities, such as mopping or sewing, and that her hand would become numb at night.  (R. at 353.)  Further, Fields claimed that she had to prop her hand on a pillow at night and that at times the pain woke her up and hurt all the way to her elbow.  (R. at 353.) Looney diagnosed Fields with probable carpal tunnel syndrome.  (R. at 353.)  Additionally, on December 1, 2006, Fields presented to SHMS reporting that her right hand shook, tingled and went numb, and she claimed that when these symptoms occurred it felt as if they were

traveling to her neck. (R. at 358-59.) Fields alleged that theses symptoms had occurred for an extended time, but had worsened and that her hand was weak. (R. at 359.) Looney noted that Fields's hand had a tremor when she tried to hold it still and had decreased grip strength, but noted that she still had good use of her arm. (R. at 359.)

On May 15, 2007, Fields presented to TCHC complaining of right arm pain and stated that she could not lift it without pain. (R. at 393.) On May 29, 2007, Fields reported to TCHC that she could not use her right arm the way she would like, and she complained of continued pain. (R. at 394.)

Fields presented to the University of Virginia to have a neurology study to determine the cause of her right hand numbness and tingling on March 8, 2007. (R. at 406-07.) It was noted that the studies were normal and there was no electrophysiological evidence for a right median neuropathy at the wrist or a right cervical radiculopathy. (R. at 407.)

The Social Security Regulations, ("S.S.R."), provide that "most unskilled sedentary jobs require good use of both hands; i.e., bilateral manual dexterity. Fine movements of small objects require use of the fingers; e.g., to pick or pinch. Most unskilled sedentary jobs require good use of the hands and fingers for repetitive hand-finger actions." *See* S.S.R. 96-9p. The S.S.R. further provides that, "[a]ny significant manipulative limitation of an individual's ability to handle and work with small objects with both hands will result in a significant erosion of the unskilled sedentary occupational base." *See* S.S.R. 96-9p. However, if the limitation is less significant than an outright prohibition against occupations

requiring bilateral manual dexterity, a vocational resource can be utilized to determine the ability to perform sedentary occupations. *See* S.S.R. 96-9p.

The ALJ did not prohibit *all* occupations requiring bilateral manual dexterity, only those that required repetitive use of the right hand for manipulation; thus, the ALJ determined that Fields could still use her right hand, just not repetitively for fine manipulation. As such, the ALJ could refer to a vocational source to determine if Fields was precluded from employment. The ALJ received testimony from a vocational expert. (R. at 436-43). The ALJ asked the vocational expert to consider a hypothetical individual at the sedentary level of exertion, with the limitations that she eventually placed upon Fields: the hypothetical individual would have a moderate reduction in concentration, limiting her to simple, non-complex tasks; she would need to make brief postural adjustments a couple of times more than normal; she could never climb, but could occasionally balance, kneel, crouch, crawl and stoop; she should be in air-conditioned and heated environments, rather than outdoors; *and she should not be in a job that required repetitive use of the right hand for fine manipulation*. (R. at 437.) The vocational expert then opined that the hypothetical individual could work as a non-emergency dispatcher, a security monitor and a surveillance system monitor, finding that the jobs existed in significant numbers in the national and regional economies. (R. at 438-39.) Although the ALJ placed limitations on Fields's use of her right hand, the vocational expert found that she was not precluded from employment; thus, she was not disabled. As such, the ALJ did not err in finding that Fields could perform unskilled, sedentary work.

I also find that the ALJ's physical residual functional capacity findings were supported by substantial evidence. As outlined above, a serious right, upper-extremity impairment was not found. Looney, a nurse practitioner, diagnosed Fields with "probable carpal tunnel" syndrome, (R. at 353), noted that she had a tremor while trying to hold her hand still and had decreased grip strength, but noted that she still had good use of her arm. (R. at 359.) Moreover, Drs. Humphries, Shahane and Surrusco did not note any significant abnormalities, limitations or diagnoses related to Fields's right, upper extremity. (R. at 223-23, 241-248, 327-332.) Additionally, neurology testing performed at the University of Virginia did not reveal any abnormalities. (R. at 406-07.) However, the ALJ still found that Fields had possible carpal tunnel syndrome, (R. at 19), as supported by Looney, and found that she should avoid repetitive use of her right hand for manipulation. (R. at 25.) Thus, the objective medical evidence does not contradict the findings of the ALJ, rather they support those findings. Accordingly, I find that the ALJ's physical residual functional capacity findings were supported by substantial evidence.

Next, the court will address Fields's claim that the ALJ's mental residual functional capacity findings were not supported by substantial evidence. (Plaintiff's Brief. at 12-19.) Fields argues that the ALJ substituted her opinion for that of a trained professional when she "rejected every treating source opinion of record and offered her own opinion as to the effect Plaintiff's mental impairments have on her ability to work." (Plaintiff's Brief at 13.) Fields argues that she is more mentally limited than the ALJ found. (Plaintiff's Brief at 13-16.)

"In the absence of any psychiatric or psychological evidence to support [her] position, the ALJ simply does not possess the competency to substitute [her] views on the severity of plaintiff's psychiatric problems for that of a trained profession." *Grimmet v. Heckler*, 607 F. Supp. 502, 503 (S.D.W.Va. 1985.) (citing *Mclain*, 715 F.2d at 869; *Oppenheim v. Finch*, 495 F.2d 396, 397 (4th Cir. 1974). In this case the ALJ found that Fields suffered from depression, (R. at 19), but that there was no evidence that the impairments satisfied the diagnostic criteria. (R. at 25.) However, the ALJ found that due to the combination of pain and moderate reduction in concentration from depression, Fields was limited to simple, non-complex tasks. (R. at 26.)

Leizer, a state agency psychologist, completed a PRTF on March 21, 2006, in which he diagnosed Fields with depressive disorder, not otherwise specified, but noted that it was not severe and did not meet diagnostic criteria. (R. at 227-240.) Leizer opined that Fields would not experience any limitations in her daily activities, or abilities to maintain social functioning, concentration, persistence or pace, and there was no evidence of episodes of decompensation. (R. at 237.) Leizer found that Fields's disability allegations were not credible, because her mental allegations were not severe and she could perform the mental demands of all levels of work. (R. at 240.)

Psychologist Jennings found Fields to suffer from depression, but noted that it was not severe and did not satisfy diagnostic criteria. (R. at 333, 336.) Jennings opined that Fields would experience mild limitations in her daily activities, and abilities to maintain social functioning and concentration, persistence or pace. (R. at 343.) There was no evidence of episodes of decompensation. (R. at 343.)

Jennings found Fields's statements to be partially credible and noted there was no evidence of a severe mental impairment. (R. at 345.)

During his October 14, 2006, consultative examination of Fields, Dr. Humphries observed her to be pleasant, alert, cooperative and in no acute distress. (R. at 225.) Additionally he noted that she behaved appropriately. (R. at 225.) Dr. Humphries did not include any psychological conditions in his diagnoses. (R. at 225.)

During her treatment with SMHS, Fields initially denied being depressed, stating only that she was anxious, and she was found to be alert and oriented in all spheres. (R. at 266.) However, on June 19, 2005, Fields reported to SMHS that she was depressed, tearful, snappy, "kind of down," hateful, and stated that she did not feel like doing anything. (R. at 258.) Looney observed Fields to be tearful at times and diagnosed her with depression. (R. at 258.) To help treat her depression, Looney prescribed Lexapro. (R. at 258.) On June 24, 2005, Fields told Looney that Lexapro was working and she liked the medication. (R. at 257.) Fields was observed to be pleasant, alert and oriented and in no acute distress. (R. at 257.)

Almost a year later, on June 13, 2006, Fields reported to Looney that she was not experiencing depression and had not taken Lexapro for a year. (R. at 251.) However, she claimed to be moody and irritable and requested estrogen. (R. at 251.) A short time later, on September 21, 2006, Fields returned to SMHS and claimed that she quit Lexapro because it gave her headaches, and she requested a different medication because she had been irritable and moody. (R. at 249.)

Although, Looney observed Fields to be pleasant, alert and oriented and in no acute distress, she prescribed Prozac. (R. at 249.) On October 19, 2006, Fields claimed that Prozac worked, and she was observed to be pleasant, alert and oriented, and in no acute distress. (R. at 353.)

Less than a month later, on November 16, 2006, Fields reported that she had been tearful, angry and agitated for two weeks. (R. at 355-57.) Fields admitted that Prozac helped her depression when she actually took it. (R. at 356.) Looney diagnosed Fields with depression and anxiety. (R. at 356.) Looney recommended that Fields stop taking Prozac, fearing that she might have manic-depressive disorder. (R. at 357.) On December 1, 2006, Fields reported that she was depressed, but that her anxiety was under control after taking lithium. (R. at 359.) On December 28, 2006, Fields stated that her moodiness was better, but that her energy had decreased. (R. at 361.) Looney observed Fields to be alert and oriented, pleasant and in no acute distress. (R. at 361.) Fields was diagnosed with anxiety, depression and menopause, and she was prescribed Celexa and Lithium. (R. at 361.) Finally, on March 6, 2007, Fields reported that she was doing well with her depression and was observed to be pleasant, alert and oriented and in no acute distress. (R. at 363.) Looney added Wellbutrin to Fields's other medications to boost her libido. (R. at 363.)

Fields reported to psychologist Farley on November 29, 2006, after being referred by Looney. (R. at 366-67.) Fields reported that she suffered from depression and anxiety, and stated that she felt "edgy." (R. at 366.) Farley noted that Fields listed the following symptoms: dysphoria, social withdrawal, anergia,

memory problems, diminished concentration, short attention span, increased irritability, low frustration tolerance, initial insomnia and intermittent wakening, feelings of helplessness and hopelessness and increased nervousness. (R. at 366.) Fields also verbalized low self-esteem, and while she denied suicidal ideations, she reported that she often wondered if she would be better off dead. (R. at 366

Farley found Fields to be cooperative and with an intelligence level in the low average range. (R. at 367.) He noted that Fields did not have a history of delusions or hallucinations, had a mildly impaired memory and concentration, had a diminished frustration tolerance and appeared significantly depressed and anxious. (R. at 367.) Farley diagnosed Fields with major depression, single episode, mild. (R. at 367.) Farley assessed Fields with a then-current GAF score of 65. (R. at 367.) Farley opined that Fields needed further evalutation to determine the validity of a bipolar mood disorder diagnosis. (R. at 367.) Farley recommended that Fields participate in psychotherapy on a biweekly basis for at least four months and continue on psychoactive medication as prescribed by Looney. (R. at 367.)

Fields returned for a counseling session with Farley on December 13, 2006. (R. at 368.) Farley noted that Fields was oriented in all spheres, cooperative, neat, clean, not restless, calm, appropriately dressed and maintaining an appropriate behavior. (R. at 368.) However, Fields stated that she had not experienced a change in symptoms since her initial visit and reported that she was experiencing sleep disturbance, anergia, anhedonia, crying and decreased concentration. (R. at 368.) Fields denied any "high risk indicators," such as suicidal ideations and

thoughts. (R. at 368.) Farley opined that Fields should continue with her current treatment, and reiterated her then-current GAF score of 65, but noted that her highest GAF score in the past year was 80. (R. at 368.) Although, Farley opined that Fields needed to engage in regular counseling sessions, she quit after only two appointments; as such, Farley stated that he did not have enough information to make a proper evaluation. (R. at 365.)

On April 25, 2007, Fields sought counseling at CMCS and was treated by counselor Hall-Anderson. (R. at 372-76.) Hall-Anderson diagnosed Fields with major depressive disorder, recurrent. (R. at 372.) Hall-Anderson assessed Fields with a then-current GAF score of 50. (R. at 372.) Fields was observed to be well-groomed, calm, cooperative and with a flat affect. (R. at 373.) Fields reported that she had been experiencing moderate insomnia, mild crying spells, mild irritability, decreased energy and increased appetite. (R. at 373-74.) Fields's orientation was found to be intact, but her memory, concentration, insight and judgment were impaired or limited. (R. at 374.)

Fields returned to CMCS for a counseling session with Hall-Anderson on May 14, 2007. (R. at 391.) Hall-Anderson observed Fields to display the following mental status factors: flat affect, depressed mood, cooperative, verbal, oriented in all spheres, without hallucinations, delusions or suicidal or homicidal ideations, exhibiting adequate self-care and improved insight and judgment. (R. at 391.) Fields presented to Hall-Anderson again on May 24, 2007, and demonstrated the following mental status: flat affect, depressed mood, tearful at times, red puffy

eyes, cooperative, verbal, oriented in all spheres, impaired memory and concentration at times, adequate self-care, fair insight and judgment, and Fields denied suicidal or homicidal ideations.  (R. at 392.)

Hall-Anderson completed a Medical Assessment Of Ability To Do Work-Related Activities (Mental) on May 24, 2007.  (R. at 377-78.)  Hall-Anderson opined that Fields's abilities to follow work rules and function independently were fair, while she had poor or no abilities to deal with work stresses and maintain attention and concentration.  (R. at 377.)  Hall-Anderson noted that Fields had poor concentration at times.  (R. at 377.)  Hall-Anderson stated that she based her opinions on that fact that Fields had an increase in depression and anxiety, which she found caused a decrease in attention and concentration, and Fields reported to her that she could not handle stress well.  (R. at 377.)  Hall-Anderson opined that Fields had a fair ability to understand, remember and carry out complex job instructions and a good ability to understand, remember and carry out simple job instructions; Hall-Anderson explained that Fields had an average intellect and poor short-term memory, stating that she was forgetting details from two days prior.  (R. at 278.)  Hall-Anderson found that Fields had a good ability to maintain personal appearance and demonstrate reliability and fair abilities to behave in an emotionally stable manner and relate predictably in social situations.  (R. at 378.) Continuing, Hall-Anderson stated that Fields's personal hygiene was always good, she was reliable about keeping appointments, but due to depression and anxiety it was difficult to predict her emotional behavior on a daily basis or in social situations.  (R. at 378.)  Finally, Hall-Anderson opined that Fields could manage her benefits in her best interest.  (R. at 378.)

Counselor Taylor completed a Medical Assessment Of Ability To Do Work-Related Activities (Mental) on June 11, 2007. (R. at 380-81.) Taylor opined that Fields had a fair ability to follow work rules, noting that she had poor concentration at times, and she stated that Fields often forgot what she was talking about in the middle of the conversation. (R. at 380.) Taylor stated that she could not comment on Fields's work activities or behaviors because she had not observed them. (R. at 380.) Taylor found that Fields had poor or no ablity to understand, remember and carry out complex or detailed job instructions and had a fair ability to understand, remember and carry out simple job instructions. (R. at 381.) The basis for Taylor's opinion came from Fields stating that she had a poor memory and could not concentrate on or remember job instructions. (R. at 381.) Taylor found that Fields had a good ability to maintain personal appearance and fair abilities to behave in an emotionally stable manner, relate predictably in social situations and demonstrate reliability. (R. at 381.) Taylor explained that Fields was tearful when arriving at the office and claimed to become angry easily. (R. at 381.) Taylor found that Fields could manage benefits in her own best interest if they are awarded. (R. at 381.) angry easily. (R. at 381.)

After consideration of all the psychological medical evidence of record, the ALJ noted that psychologist Farley found only mild limitations, did not express any significant objective abnormalities and did not have enough time to properly evaluate Fields due to her discontinuation of treatment. (R. at 24.) Also, the ALJ noted that psychologists Jennings and Leizer did not find any severe impairments. (R. at 24.) Further, the ALJ stated that, under the Act, the opinions of Hall-Anderson and Taylor cannot be accorded great or controlling weight because they

are not physicians or psychologists.  (R. at 25.)  However, the ALJ noted that the opinions of Hall-Anderson and Taylor are still evidence, and she considered that evidence in making her determination.  (R. at 25.)


I am of the opinion that there is substantial evidence of record to support the ALJ's mental residual functional capacity findings.  Further, I find that the ALJ did not substitute her opinion for that of a trained professional. Although the ALJ did not accord great or controlling weight to the opinions of Hall-Anderson or Taylor, she properly considered them and used them in her assessment.  (R. at 25.) *See* 20 C.F.R. §§ 404.1513, 404.1527, 416.913, 416.927.  The objective evidence did not show a disabling mental condition.  The psychologists' opinions were that Fields did not suffer from a severe impairment.  (R. at 227-240, 333-345, 365-368.)  In accordance with the opinions of the psychologists, and with consideration of the opinions of the counselors, the ALJ gave "the maximum benefit of the doubt" to Fields and found that she suffered from depression.  However, in line with the opinions of the psychologists, the ALJ properly found that the condition was not severe or disabling.  Thus, the ALJ made a finding that Fields was not disabled, and such finding is supported by substantial evidence of record.


## IV. Conclusion


For the foregoing reasons, I will deny Fields's motion for summary judgment, grant the Commissioner's motion for summary judgment and affirm the final decision of the Commissioner denying benefits.

An appropriate judgment will be entered.

**DATED:** This 26th day of February 2010

/s/  James P. Jones
Chief United States District Judge